# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JACOB RODRIGUEZ,

 Plaintiff,

v.             No. 2:17-cv-00576-JCH-JFR

PEAK PRESSURE CONTROL, L.L.C.,
and NINE ENERGY SERVICES, L.L.C.,

 Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Jacob Rodriguez's "Motion in Support of Rule 23 Certification." (ECF No. 30). Mr. Rodriguez, individually and on behalf of others similarly situated, alleges that Defendants Peak Pressure Control, L.L.C. and Nine Energy Services, L.L.C. (Defendants) violated New Mexico Minimum Wage Act, N.M. Stat. Ann. § 50-4-22 (MWA), by failing to compensate pressure control operators for hours worked in excess of forty hours per week. Mr. Rodriguez moves for class certification of his MWA claim pursuant to Federal Rule of Civil Procedure 23. Having considered the motion, Defendants' response brief in opposition (ECF No. 35), Mr. Rodriguez's reply (ECF No. 41), the parties' evidentiary submissions, and the relevant law, the Court concludes that the motion should be granted.

## A. FACTUAL BACKGROUND

Before filing this lawsuit, Mr. Rodriguez had opted-in to a class action case against the same Defendants in the United States District Court for the Western District of Texas involving Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, claims. *See Snively v. Peak Pressure Control, LLC*, NO. MO:15-CV-00134-RAJ-DC (hereinafter "*Snively*"). Mr. Rodriguez later withdrew from that case, however, to pursue this litigation in his home state, New Mexico.

The parties in the case at bar tendered significant discovery from the Texas litigation, including corporate depositions and opt-in depositions that the Court may properly consider at the class certification stage. *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (noting that "it may be necessary for a district court to probe behind the pleadings" when analyzing a Rule 23 motion)*; Wiener v. Dannon Co.*, 255 F.R.D. 658, 664 (C.D. Cal. 2009) ("Because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising plaintiff's cause of action, … a court must often look to evidence beyond the pleadings.") (citations and internal quotation marks omitted).

Defendants provide oil and gas industry customers "wireline" pressure control and other oilfield services. Pl.'s First Am. Class Action Compl., ¶ 2, ECF No. 21; Pl.'s Ex. B, ECF No. 30-2, 2. Mr. Rodriguez worked for Defendants as a pressure control operator (PCO) from September 2014 to January 2015. ECF No. 21 at ¶¶ 2, 4. According to Mr. Rodriguez's first amended complaint, his and other PCOs' primary job duty was to operate pressure control equipment and tools – a job that was routine, rote, and consisted mainly of performing manual and technical labor. *Id*. at ¶¶ 15, 17-18, 26, 28. Mr. Rodriguez and other PCOs performed no non-manual work related to the management of Defendants' business, exercised no discretion, and had no firing or hiring authority. *Id*. at ¶¶ 16-17, 19-20, 26, 29-31. Mr. Rodriguez contends that Defendants regularly scheduled Mr. Rodriguez and others to work 12-hour days and work a minimum of 84-hours per week. *Id*. at ¶¶ 21, 32. Defendants "failed to pay [Mr. Rodriguez] any overtime premium for all hours worked in excess of 40 hours per workweek during the time period Plaintiff received compensation on a salary or salary plus non-discretionary bonus basis." *Id*. at ¶ 23.

Defendants similarly "misclassified" other PCOs as exempt and paid them on a salary or salary-plus-bonus basis with no overtime pay. *Id*. at ¶ 34. In total, Defendants allegedly

misclassified 150 PCOs that worked for Defendants in Texas and New Mexico during the relevant class time period. Decl. of Jack Siegel, ECF No. 30-25, 4. Mr. Rodriguez contends that his lawsuit is properly maintainable as a class action under Federal Rule of Civil Procedures 23(b)(2) and (b)(3) for alleged violations of the MWA because common questions of law and fact predominate over questions affecting any individual PCO. ECF No. 21 at ¶¶ 47, 48, 49, 51.

Defendants admitted in their answer that Mr. Rodriguez and others were classified as exempt from the overtime wage protections of the MWA. Defs.' Answer, ¶¶ 43-44, ECF No. 22. According to Defendants, however, Mr. Rodriguez and putative class members were employed in a bona fide executive or administrative capacity and were forepersons, superintendents and/or supervisors. *Id*. at 14. Mr. Rodriguez alleges that Defendants have classified PCOs as exempt since at least 2010 based on industry practice.

In his motion to certify, Mr. Rodriguez argues that Defendants misclassified PCOs within executive or administrative roles to maintain their exempt statuses when, in fact, PCOs are "production workers performing manual labor" who are "the lowest level employees in Defendants' organizational hierarchy." ECF No. 30 at 3. Defendants' senior employees make decisions about Defendants' general business operations. *Id*. at 8. Moreover, Defendants' upper level management oversees all pressure control operations from its headquarters in Houston, Texas, whereas Defendants provide their pressure control services from their Midland shop. Depo. of Bruce Morgan, 40:5; 41:8-9, ECF No. 30-11.

In addition to describing Defendants' hierarchy, Mr. Rodriguez presents a highly detailed description of the manual nature of PCOs' work. The Court presents a summary of PCOs' job duties as follows.

PCOs have significant preparatory work before setting up at a jobsite. PCOs would report to Defendants' shop to get information from shop managers or supervisors about the given job, including what tools or equipment to bring to the jobsite. Decl. of Jacob Rodriguez, ¶ 7, ECF No. 30-24. Mr. Rodriguez explained that PCOs' preparatory work included cleaning and maintaining tools and equipment by washing trucks, equipment and tools; checking equipment for leaks or other repairs; filling up units with fluids, diesel, and grease, and replacing valves; pulling and breaking apart hoses; and loading the equipment and tools. *Id*. After that the shop manager or another manager would typically inspect the PCO's equipment and tools before he or she headed to a jobsite. *Id*. The preparatory shop work could take anywhere between three hours to a full day depending on the condition of the equipment and tools. Depo. of Jose Samano, 189:2-25 – 190:1-14, ECF No. 30-3.

Once at the jobsite where the customer's well was located, PCOs would sign in with the "company man" to let him know he had arrived. *Id*. at 92:7-13. According to Mr. Rodriguez, "wireline personnel" and "company men," are the jobsite points-of-contact between Defendants and the customer and the employees from whom PCOs took their orders. ECF No. 30 at 3. PCOs then were directed by the wireline engineer or another manager on how to physically set up (called rigging up) the equipment, which involved dragging around hundreds of feet of hoses, laying down lubricator and guiding the lubricator into a crane, and getting into a man-lift to reach the wellhead and put a nightcap onto the well. Depo. of Uriel Sanchez, 160:18-24, ECF No. 30-4; ECF No. 30-24 at ¶ 7. The rigging up process typically took an hour or more, with about half of that time spent on screwing in the flange in the harness. *Id*. PCOs then did this same process in reverse to "rig down." *Id*. PCOs wore company-provided hardhats, safety glasses, boots, harnesses, H2S

monitors, and fire-resistant coveralls while on the job. ECF No. 30-4 at 64:23-24; Depo. of Jason Snively, 65:10-25, ECF No. 30-9.

In addition to the rigging up and rigging down process, PCOs would support wireline after fracking operations were complete. PCOs would assist another wireline company by getting back into their harness to take the nightcap off the well head before each wireline run. ECF No. 30-24 at ¶ 9. This process apparently involved holding a heavy lubricator in place. Depo. of William Carter, 23:20-21, ECF No. 30-10. If the cap was hard to unscrew, the PCO would use a hammer or chain tongs to loosen it. *Id.* at 24:7-13. In those moments when wireline was not operational, then the PCO would typically take a break or otherwise continue to work by maintaining equipment and preparing for the next wireline run. Depo. of Bruce Morgan, 102:11-25, ECF No. 30-11.

According to Mr. Rodriguez, to be a PCO, one must have the equivalent of a high school diploma; be certified/able to be certified to operate a crane, pressure control, and a commercial truck; be willing to work outside under dangerous conditions; and have the ability to lift heavy objects and to complete a physical capacity test. PCOs make a base salary of $40,000 and some PCOs earn more than $100,000 annually. Decl. of Bruce Morgan, ECF No. 30-1, ¶ 17.

Mr. Rodriguez supported his motion with declarations from 37 current or former PCOs. *See* Pl.'s Ex. W, ECF No. 32-23. The declarants state that as PCOs their primary duty was maintaining wellbore pressure at the wellsite and that their tasks included preparatory work, traveling to job sites, rigging up, support wireline, rigging down, and heading back to the shop. Decl. of Joshua Salazar, ¶¶ 2-3, 5-8; Decl. of Jacob Lee Cowan, ¶¶ 2-3, 5-8, all located at ECF No 30-23. The declarants claim that they did not manage others, supervise two or more employees, make recommendations on how to run or improve Defendants' business affairs; and did not have

responsibility for jobsite safety issues or advise on regulatory matters. ECF No. 30-23 at 43-45, ¶¶ 4, 10-13, 16-17; 61-63, ¶¶ 4, 10-13, 16-17. Fifty to one hundred percent of the declarants' work was performed in New Mexico and the declarants estimated that they would work over forty hours per week for Defendants. ECF No. 30-23 at 45, ¶ 18; 63, ¶ 18.

In their opposition brief, Defendants contend that Mr. Rodriguez omits the critical fact that he was a trainee, not a PCO, and that distinction matters greatly. PCOs have greater skills and oilfield experience than a trainee. Depo. of Eddie Merryman, 19:1-3, ECF No. 35-3. Additionally, trainees may initially work in the company shop for a period under the direction of a PCO before working in the field with an experienced PCO. *Id*. at 22:22-25; 24:5-7; Depo. of Jeff Tranum, 106:17-23, ECF No. 35-5. Seven PCOs and putative class members testified that PCOs engaged in training trainees how to do the job of a PCO, and one such PCO, Blaine Everhart, testified that a PCO was deemed a "pressure control supervisor," when training other employees. Depo. of Blain Everhart, 55:2-8, ECF No. 35-12. Moreover, PCOs could recommend whether a trainee should be promoted to a PCO. ECF No. 35-6 at 120:15-21. If promoted, the trainee received a pay increase. ECF No. 35-3 at 20:20-23. Mr. Rodriguez was a trainee the duration of his employment with Defendants. Decl. of Eddie Merryman, ¶¶ 4-5, ECF No. 35-2.

In addition, PCOs must hold a commercial driver's license (CDL), which enabled them to drive a Ford F-550 to jobsites. Defs.' Ex. A at ¶¶ 8, 11. Some of the putative class members, in contrast, did not always possess a CDL, which meant that they relied on a PCO to transport heavy-duty equipment using his Ford F-550 while the trainee drove a smaller Ford F-250 truck. Depo. of Stephen Clark, 9:11-13, ECF No. 35-16; Depo. of Ross M. Coston, 89:4-9, ECF No. 35-4. Additionally, Defendants assigned some putative class members specific vehicles while others were not assigned a specific truck at all. Depo. of Oscar Rogelio Dovalina Sanchez, 63:1-3, ECF

No. 35-11; Depo. of Jose Antonio Carrizales, 66:5-8, ECF No. 35-8. Thus, according to Defendants, not all putative class members possessed a CDL, which in turn governed the models of trucks they operated (F-550 or F-250), and whether they were assigned a truck by Defendants.

**B.    PROCEDURAL HISTORY**

As noted earlier, in 2015 PCOs Jason Snively and Stephen Clark sought class certification of a group of PCOs under the FLSA in Texas federal court for being paid under a base salary plus bonus compensation that did not provide overtime compensation for hours worked in excess of forty hours in a week. *Snively*, 174 F. Supp. 3d at 956. The district court conditionally certified a class of "[a]ll current and former Pressure Control Operators employed by [Defendants]" and ordered Defendants to produce the names, last known addresses, e-mail addresses, and telephone numbers of potential opt-in plaintiffs. *Id*. at 963-64. In response, Defendants identified Mr. Rodriguez and about 130 other PCOs as similarly situated to the *Snivley* class representatives. Decl. of Jack Siegel, 3, ECF No. 30-25.

Although Mr. Rodriguez initially opted-in to the *Snively* litigation, he later withdrew his consent to pursue this lawsuit in the District of New Mexico under the MWA. Mr. Rodriguez alleges that he is a citizen of New Mexico, that Defendants are citizens of a State other than New Mexico, that the amount in controversy exceeds $5,000,000, and that jurisdiction arises under 28 U.S.C.A. § 1332(d)(2)(A) (conferring original jurisdiction to federal district courts "of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, … and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.").

Mr. Rodriguez's first amended complaint alleges a single cause of action against Defendants under the MWA for wage violations. Mr. Rodriguez proffered a class definition of:

Defendants' current and former pressure control operators and pressure controllers who receive pay on a salary or salary-plus-bonus basis who worked over 40 hours in at least one workweek in New Mexico over the past three years.

ECF No. 21 at ¶ 5.

## C.  LEGAL STANDARDS

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted). Mr. Rodriguez claims that his proposed class action may be certified under both Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure. As such, Mr. Rodriguez must meet the requirements for monetary relief as well as the threshold requirements for class certification under Rule 23(a).[1]

### 1. Rule 23(a) Prerequisites

Rule 23(a) of the Federal Rules of Civil Procedure provides that a class may be certified only if four prerequisites have been met: numerosity, commonality, typicality, and adequacy of representation. *See Dukes*, 564 U.S. at 349. The Rule provides as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

---

[1] Although Mr. Rodriguez sought class certification for injunctive relief under Rule 23(b)(2), which provides that a class action may only be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2), Mr. Rodriguez did not move for certification of a Rule 23(b)(2) class. Therefore, the Court does not adjudicate or decide Mr. Rodriguez's request for classwide injunctive relief.

Fed. R. Civ. P. 23(a). These requirements "do[] not set forth a mere pleading standard. A party seeking class certification must ... be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350. "Further, the district court has an independent obligation to conduct a rigorous analysis before concluding that Rule 23's requirements have been satisfied. Often that analysis requires looking at the merits of a plaintiff's claims." *XTO Energy, Inc.*, 725 F.3d at 1217 (internal quotation marks and citations omitted).

### 2. 23(b)(3) Requirements

Rule 23(b)(3) imposes two additional burdens on plaintiffs attempting to proceed by class action, namely, predominance and superiority. *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018). Specifically, a class may be certified only if the district court determines as follows:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

With respect to common issues, Rule 23(b)(3) imposes a "far more demanding" inquiry into the common issues which serve as the basis for class certification. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "To satisfy Rule 23(b)(3), a plaintiff must 'show that common questions subject to generalized, classwide proof *predominate* over individual questions.'" *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (quoting *Comcast*

*Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). While the inquiry may be more demanding, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted) (alterations in original). Rather, all that is required is that a class plaintiff show that "common questions 'predominate.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). "[T]his doesn't mean a plaintiff must show that all of the elements of the claim entail questions of fact and law that are common to the class" or "that the answers to those common questions [are] dispositive" of the claim. *Chaparral Energy, LLC*, 923 F.3d at 789 (citation omitted).

Finally, the district court must determinate that class certification is the superior method for adjudicating these claims. *See* Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability—which courts should consider in making these determinations. Fed. R. Civ. P. 23(b)(3)(A)-(D). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citing *Amchem Prods., Inc.*, 521 U.S. at 614).

**D.   ANALYSIS**

**1. Rule 23(a) Prerequisites**

As noted earlier, Defendants argue that Mr. Rodriguez fails to satisfy all four of Rule 23(a)'s prerequisites—numerosity, commonality, typicality, and adequacy of representation – necessitating the Court's analysis of each component.

**a. Numerosity**

When it comes to the first requirement, numerosity, "[t]he burden is upon plaintiff[] seeking to represent a class to establish that the class is so numerous as to make joinder impracticable." *Peterson v. Okla. City Hous. Auth.,* 545 F.2d 1270, 1273 (10th Cir. 1976). The plaintiff must offer 'some evidence of established, ascertainable numbers constituting the class,' but there is 'no set formula to determine if the class is so numerous that it should be so certified.'" *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214–15 (10th Cir. 2014) (quoting *Rex v. Owens ex rel. Okla.,* 585 F.2d 432, 436 (10th Cir. 1978)). The inquiry is "fact-specific," *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006), and the district court's analysis of the impracticability issue considers factors such as "the nature of the action, the size of the individual claims, and the location of the members of the class ...." *Colorado Cross Disability Coal.*, 765 F.3d at 1215.

In support of his numerosity argument, Mr. Rodriguez points to evidence that Defendants have employed 150 putative class members within the relevant class period and that Defendants perform over 50% of their work for New Mexico based customers. Given the relatively large size of the class and its geographic diversity, Mr. Rodriguez has carried his burden of proof to show that joinder would be impractical. *See Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 310 F.R.D. 631, 669 (D.N.M. 2015) ("plaintiffs may establish that joinder would be impracticable with as few as fifty members.") (citations omitted).

### b. Commonality and Typicality

Concerning the commonality requirement under Rule 23(a), a plaintiff must "demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes,* 564 U.S. at 350 (internal quotation

marks and citation omitted). A plaintiff's claims "must depend upon a common contention" and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Furthermore, sometimes "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 349 n. 5 (alteration in original) (quotation omitted).

Mr. Rodriguez argues that commonality is met because Defendants subjected the putative class to (1) a uniform exemption policy (2) a uniform description of their job duties, and (3) the PCOs reported to managers at a single location in Midland, Texas. Mr. Rodriguez posits nine common questions concerning the "executive" or "administrative" exemptions that he believes can be answered on a classwide basis.

In response, Defendants do not dispute that they classified PCOs and trainees as exempt executive or administrative workers and that these individuals worked from Defendants' Texas locations. However, Defendants argue that individualized evidence regarding which exemption applies to which class member will require an assessment of each class member's job duties depending on whether they were a PCO or trainee. Specifically, Defendants contend that the job duties of the two groups vary in the following ways: trainees did not work alone and were generally not permitted to run a pressure control job on their own, whereas a PCO was responsible for all aspects of the job; PCOs instructed and guided trainees; trainees sometimes lacked a commercial driver's license, whereas PCOs were required to have such licenses; trainees spent time in the shop

learning about the equipment; and, a PCO's recommendation that a trainee be promoted was given significant weight.

In addition, Defendants argue that answering the question of whether the class members worked in excess of 40 hours in a workweek in New Mexico will require individualized evidence of each member's workweek in New Mexico. Defendants point to the alleged disparities among 37 declarations in the record, noting that some declarants estimate that they worked in excess of 40 hours for one week, whereas others stated that they worked overtime for 40 weeks. In addition, Defendants argue that the percentage of time worked in New Mexico is not uniform across the class. *Compare e.g.* Decl. of Oneill Campbell, ECF No. 30-23, ¶ 18 at 79 (50-100% of work done in New Mexico), *with* Decl. of Uriel Sanchez, ECF No. 30-23 ¶ 18 at 102 (5-10% of work done in New Mexico).

In support of his commonality argument, Mr. Rodriguez relies extensively on a "misclassification" case from the Southern District of New York, *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 410 (S.D.N.Y. 2013). In *Jacob*, a group of assistant store managers employed by Duane Reade (DR), a drug and convenience store franchise in the New York City area, claimed that DR misclassified them as exempt administrators or executives under the FLSA and New York labor law in order to avoid paying them overtime wages. *Id*. at 411-12. The plaintiffs claimed that DR's written job description characterizing their role as managers did not accurately reflect the job duties the plaintiffs actually performed. *Id*. at 411. DR countered that to prove this contention, the plaintiffs would require individualized testimony that workers' actual duties deviated from the written job description, thus making the litigation incapable of resolution on a classwide scale. *Id*. at 411, 414. The district court rejected this argument. First, the putative class had "similar baseline responsibilities" and "commonality d[id] not require plaintiffs to show that class members perform

identical duties – an impossible task." *Id*. at 415 (citation and internal quotation marks omitted). Second, "[w]hether these baseline responsibilities require[d] a degree of individualized proof that defeats … common questions," was better suited for Rule 23(b)(3)'s predominance inquiry. *Id*. at 415-16. Third, the district court held that the ultimate merits of the plaintiffs' claims – whether or not DR misclassified its workers as administrators or executives – were largely beyond the scope of the class certification question. *Id*. at 414.

The Court finds persuasive *Jacob*'s reasoning and concludes that Mr. Rodriguez has met the commonality requirement by a preponderance of the evidence. First, Defendants use a uniform job description, whether hiring the individual as a PCO or trainee, which is a common element of proof. For instance, under Defendants' uniform job description, a PCO must have a high school diploma or the equivalent, the ability to work at dangerous outdoor worksites and lift heavy objects, and be licensed and certified to operate a crane, pressure control machine, and a commercial truck, or the ability to obtain such licensing and certification within 120 days. This is all common evidence of PCOs' job duties.

Second, Mr. Rodriguez's declaration and those of 37 putative class members shows that the declarants' job duties are largely consistent. Defendants argue that this is not so. They contend that the putative class members' own description of their job duties "varies immensely depending on their individual experiences." ECF No. 35 at 7. For instance, PCO Carrizales testified that his primarily job at one point was training other employees. Additionally, while the declarants attested that their primary duty was to maintain wellbore pressure, Defendants point to the deposition testimony of at least five other PCOs who testified that part of their job was to train new hires. Defendants also emphasize that trainees did not work alone and that their possession, or lack thereof, of a CDL altered the work trainees could perform. However, to meet Rule 23(a)'s

commonality requirement, "[e]very member of the class need not be in a situation identical to that of the named plaintiff." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010). The Court's review of the record shows that Mr. Rodriguez and the putative class members share the same baseline job responsibilities, which is a common element of proof. "Whether these baseline responsibilities require a degree of individualized proof that defeats the similarities of the common questions … is a question best suited for the predominance inquiry," of Rule 23(b)(3). *Jacob*, 289 F.R.D. at 415–16. Furthermore, the ultimate merits of the putative class's claim are largely beyond the scope of the class certification question. *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) ("For the purposes of class certification, our primary function is ... not to make a determination on the merits of the putative class's claims.").

Third, Defendants uniformly classify all PCOs and PCO trainees as exempt without making an individualized determination of each worker's individual responsibilities. As explained *infra*, although the fact of common exemption, without more, does not suffice to establish commonality, *see In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009), uniform exemption classification "is certainly relevant to the court's decision and weighs in favor of class certification." *Jacob I,* 289 F.R.D. at 415.

In support of their arguments that Mr. Rodriguez's claim and the class members' claim, Defendants cite two cases, *Luiken v. Domino's Pizza, LLC,* 705 F.3d 370, 372 (8th Cir. 2013), and *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, *supra*. Both are distinguishable. In *Luiken* a class of Domino's Pizza delivery drivers alleged that Domino's wrongly withheld a $1 per-delivery charge that drivers received no portion of. 705 F.3d at 373. Some drivers explained this charge to customers when making deliveries, while others did not. *Id*. Customers placing pizza orders online were told of the charge, while employees taking orders were supposed to say the same. *Id*. The

Eight Circuit concluded that each driver's individual interaction with customer would be required to determine whether the customer objectively believed that the charge constituted gratuity, and therefore commonality was missing. *Id*. at 375. *Luiken* is distinguishable. It was not an overtime case like this one and Mr. Rodriguez's case does not rely on individualized evidence of employee interactions with customers. Rather, Mr. Rodriguez's and the putative class members allege that Defendants have a uniform exemption policy and that PCOs have uniform job duties, which is common evidence.

*Wells Fargo* is somewhat more analogous but ultimately inapplicable. In that case, the Ninth Circuit analyzed whether the district court abused its discretion in relying on Wells Fargo's uniform overtime wage exemption policies "to the near exclusion of other factors relevant to the predominance inquiry," under Rule 23(b)(3). *Wells Fargo*, 571 F.3d at 959. Finding that the district court did abuse its discretion in according the exemption policy such undue weight, the Ninth Circuit held that "[a] fact-intensive inquiry into each potential plaintiff's employment situation," would be required whether or not Wells Fargo had in place a uniform exemption policy. *Id*. *Wells Fargo* is inapplicable. First, the Ninth Circuit conducted a predominance inquiry under Rule 23(b)(3) – not a Rule 23(a) commonality inquiry relevant here. *Id*. at 957. Second, Mr. Rodriguez and the putative class members do not merely rely upon Defendants' exemption policy. They argue that in addition to that policy, they performed consistent job duties, worked at one of two worksites, and worked from Defendant's shop in Midland, Texas. The Court concludes that this is all common evidence. *See Jacob*, 289 F.R.D. at 415 (noting that "the uniform classification" of the class members as exempt, the "uniform description of duties … and the discrete, geographical location of [defendant's] brand," satisfied commonality).

Concerning typicality, the named plaintiff's claim must be "typical of the claim[] ... of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry asks whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13 (1982). "[D]iffering fact situations of class members do not defeat typicality ... so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Menocal*, 882 F.3d at 914 (quoting *Colo. Cross Disability Coal.*, 765 F.3d at 1216); *Jacob*, 289 F.R.D. 408 at 416 ("Courts tend to interpret typicality as requiring that the class members' claims 'arise[ ] from the same course of events,' meaning 'each class member [must] make[ ] similar legal arguments to prove the defendant's liability.'") (quoting *Marisol v. Giuliani,* 126 F.3d 372, 376 (2d Cir. 1997)).

Mr. Rodriguez has met the typicality requirement by a preponderance of the evidence. The claim of all the class members, including Mr. Rodriguez, shares the same theory: that Defendants failed to pay them overtime for hours worked in excess of forty hours per work week in violation of the MWA because Defendants misclassified them as exempt. They seek identical relief – an award of all unpaid overtime wages, liquidated damages, and other costs. Rule 23(a)'s typicality component is met.

### c. Representation

Fed. R. Civ. P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "The inquiry into whether a class representative can protect the class's interest 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Tennille v. W. Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015) (quoting *Amchem Prods.,* 521 U.S. at 625)). "In order to protect the class's interest adequately and fairly, a class

representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks and citation omitted). "Resolution of … two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187 (10th Cir. 2002) (citations omitted).

Concerning the first question – conflicts of interest – Defendants contend that Mr. Rodriguez and his lawyers have created a "procedural quagmire" because some or all of the putative class members in this case are also plaintiffs in *Snively* and Mr. Rodriguez offers no explanation of "how to manage the potential for double recovery." ECF No. 35 at 24.  In some ways, however, this argument is beyond the scope of the certification stage. *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification.") (citation omitted); *Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 41 (D.D.C. 2017) ("[P]otential conflicts over the distribution of damages ... will not bar a finding of adequacy at the class certification stage.") (citation omitted). However, the Court does believe that Defendants raise legitimate "procedural quagmire" concerns, but those issues are better addressed in the Rule 23(b)(3) superiority analysis *infra*. Regarding the "conflict of interest" prong, the Court finds that the first question concerning legal adequacy is satisfied.

Concerning the second question – whether Mr. Rodriguez and his lawyers will vigorously prosecution the case on behalf of absent class members – Defendants argue that Mr. Rodriguez and his lawyers have not satisfied the adequacy requirement because: (1) Mr. Rodriguez, a trainee, cannot represent a class of PCOs; (2) there is no evidence that Mr. Rodriguez, as opposed to his

counsel "is directing the litigation or that [Mr. Rodriguez] is sufficiently informed about the litigation such that he could manage the litigation effort," ECF No. 35 at 21; and (3) Mr. Rodriguez lawyers are inadequately suited to represent the putative class. The Court addresses each argument.

First, the differing fact situations of class members – that Mr. Rodriguez was a trainee and not a PCO – are not enough to defeat Rule 23(a)'s adequacy requirement for the reasons explained *supra*. And the cases that Defendants rely upon - *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193 (E.D. Pa. 2017), *Tracy v. NVR, Inc.*, 293 F.R.D. 395 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc.*, 604 F. App'x 87 (2d Cir. 2015), and *Robinson v. Gillespie*, 219 F.R.D. 179, 187 (D. Kan. 2003) – do not persuade the Court otherwise.

In *Ctr. City Periodontists, P.C.*, 321 F.R.D. at 207, the district court found inadequate the plaintiffs' ability to represent the class because of the "plaintiff-specific defenses" resulting in "diverging interests and incentives between Plaintiffs and the Class." Here, Mr. Rodriguez and the putative class members seek identical relief and it appears that there are no defenses particular to Mr. Rodriguez. The district court's decision in *Tracy*, 293 F.R.D. at 400 is distinguishable because the court did not conduct a Rule 23(a) analysis. Rather, it decertified a class of home salespersons because of the highly individualized circumstances of the class members' job duties – namely, they worked under different managers, in different locations, and worked out-of-office to varying degrees and in different ways. Mr. Rodriguez's evidence is not nearly as individualized as in the litigants' evidence in *Tracy*. Finally, in *Robinson*, 219 F.R.D. at 187, the district court denied certification to a class with 196 proposed class representatives, noting serious manageability problems. That is not the case here – Mr. Rodriguez is this case's only proposed representative.

Defendants next argue that Mr. Rodriguez, as opposed to his counsel, must show that he "is directing the litigation" and "is sufficiently informed about the litigation such that he could

manage the litigation effort." ECF No. 35 at 21. Defendants are correct that Mr. Rodriguez filed no declaration or affidavit explaining why he withdrew from the *Snively* litigation to pursue this case, whether he is able to make critical decisions about the case's goals, and whether he is able to protect the interest of absent class members. Simply put, there is no statement in the record from Mr. Rodriguez concerning his ability to prosecute the action.

Perhaps it would have been prudent to include such a statement. But the Court finds no binding caselaw mandating such proof in the first place. While some courts require a class representative to submit affirmative proof of his or her adequacy to represent the class, others do not.[2] For his part, Mr. Rodriguez suggests that a representative's adequacy can "be established … by a simple demonstration of facts in the motion for class certification." ECF No. 41 at 14. But the authorities he cites in fact say that "the competence of *class counsel*" – rather than the representative – "may be established in the first instance by a simple demonstration of facts in the motion for class certification." 1 Newberg on Class Actions § 3:55 (5th ed.) (hereinafter "Newberg") (emphasis added); *Chakejian v. Equifax Information Services LLC*, 256 F.R.D. 492, 498 (E.D. Pa. 2009) (citing exhibits attached to the plaintiff's motion for class certification that demonstrated that "[t]he *attorneys* who represent plaintiffs are … well-qualified to conduct the proposed litigation.") (emphasis added). Contrary to Mr. Rodriguez's claim, these authorities do not answer whether affirmative proof is required from the putative class representative himself.

---

[2] *Compare Altier v. Worley Catastrophe Response, LLC*, No. CIV.A. 11-241, 2011 WL 3205229, at *10 (E.D. La. July 26, 2011) (denying class certification where the representative plaintiffs "presented *no evidence* to demonstrate that they are directing the litigation, are sufficiently informed about it to manage the litigation effort or have the willingness and ability to take an active role and protect the interests of absentee class members."), *with Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 631 (N.D. Ala. 2013) (noting that "adequate representation is usually presumed.") *and Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) ("[a]dequate representation is usually presumed in the absence of contrary evidence.").

The cases that Defendants cite provide no answer either. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996), involved a class representative's dubious fitness given his "psychological problems" – something that there is zero evidence of here. And in *Stirman v. Exxon Corp.*, 280 F.3d 554, 557 (5th Cir. 2002), the Fifth Circuit reversed the district court's sole adequacy finding that "no conflicts exist[ed]" between the named class representative and class members. But potential conflicts did exist: the proposed representative had a different natural gas lease from the leases of other class members, and she was bound by a shorter statute of limitations than that of class members residing in other jurisdictions. *Id*. Here, Mr. Rodriguez and the putative class members seek relief for the same injury based on the same course of underlying events, making *Stirman* distinguishable.[3] These cases do not demonstrate what proof, if any, is required from someone in Mr. Rodriguez's shoes to show that he is adequately suited to represent the class.

The Court will resolve the adequacy issue by following this rule: "[i]f there are any doubts about adequate representation … courts tend to either resolve them in favor of upholding the class, subject to later possible reconsideration." Newberg at § 3:55. Consistent with this rule, the Court resolves doubts about the adequacy of Mr. Rodriguez's representation in favor of certification, but subject to later reconsideration.

Finally, Defendants contend that Mr. Rodriguez has not shown that his lawyers are well-suited to represent the putative class. Defendants take issue with the declaration by Mr. Rodriguez's lawyer, Jack Siegel of the Siegal Law Group PLLC, in which Mr. Seigel declared that he specializes in representing class action plaintiffs in employment actions, and included a list of

---

[3] Defendants also cite a pair of Fifth Circuit cases that impose a heightened adequacy requirement in the context of securities fraud class actions. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 478 (5th Cir. 2001) and *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005). But this a not a securities class action case. So the heightened adequacy rule is simply inapplicable.

thirteen cases. Mr. Seigel also declared that his co-counsel, Derek Braziel, has over 20 years of experience in wage and hour cases, is on the board of editors for a FLSA treatise, and is frequently asked to speak at class action conferences. Defendants claim that the "most revealing indication of the adequacy of counsel" is their conduct in *this* litigation to date – not the volume of cases they have previously handled. ECF No. 35 at 23. In that regard, Defendants believe that Mr. Seigel and Mr. Braziel are responsible for the so-called "procedural quagmire," which undercuts their adequacy as class counsel.

The Court finds that Mr. Seigel's declaration satisfies the adequacy determination under Rule 23(a). Moreover, in considering the factors under Fed. R. Civ. P. 23(g)(1),[4] the Court concludes that Siegal Law Group PLLC (Jack Siegel and Derek Braziel) should be appointed as class counsel. Siegal Law Group has experience in class actions and knowledge of the applicable laws. It appears that Siegal Law Group has identified and investigated potential claims and nothing indicates the firm lacks the resources to represent the class.

In summary, Mr. Rodriguez has met Rule 23(a)'s prerequisites for class certification.

## 2. Rule 23(b) Requirements

In addition to the Rule 23(a) prerequisites, Defendants argue that Mr. Rodriguez fails to satisfy the two additional burdens that Rule 23(b)(3) imposes – predominance and superiority.

---

[4] Under Rule 23(g)(1), "a court that certifies a class must appoint class counsel. In appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Moreover, Defendants argue that the class is not ascertainable. The Court therefore must analyze the disputed elements of ascertainability, predominance, and superiority.

### a. Ascertainable Class

Defendants contend that the class is not ascertainable. "Although not expressly a requirement of Rule 23, most courts imply a requirement that a class definition 'be precise, objective, and presently ascertainable.'" *Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *6 (D.N.M. June 5, 2018) (quoting *In re: Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *1 (D. Kan. 2016)). "Moreover, it appears that the Tenth Circuit considers ascertainability as part of the Fed. R. Civ. P. 23(b)(3) inquiry." *Id.* (citing *Shook v. El Paso Cty.,* 386 F.3d 963, 972 (10th Cir. 2004)).

In support of their arguments that the class is not ascertainable, Defendants rely on this Court's decision in *Nlson v. Bd. of Educ. of Albuquerque Pub. Sch.,* No. CIV. 07-1027JH/RHS, 2009 WL 6055840, (D.N.M. Jan. 7, 2009). In *Nlson*, plaintiffs sought class certification for autistic schoolchildren "who have not been provided *and/or are at risk for not receiving* the full school days and full school year of schooling provided by [Albuquerque Public Schools]" *Id.* at *7. (emphases in original). The Court held that this definition lacked precision because there was no feasible way to determine which individuals were "at risk" without reference to objective criteria and it would require "speculat[ion] as to future events" to "predict where services to autistic students might fall short." *Id.* Here, there are no such problems. Class members can be readily identified by objective criteria based on Defendants' business records of putative class members' employment with Defendants. Ascertainability is met.

### b. Predominance

"Rule 23(b)(3)'s predominance requirement regularly presents the greatest obstacle to class certification." *Menocal*, 882 F.3d at 918. "[T]o determine whether a plaintiff can satisfy Rule 23(b)(3)'s predominance requirement, a court must first *characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Chaparral Energy, LLC*, 923 F.3d at 789 (citations and quotations omitted) (emphases in original). The district court does so by "consider[ing] ... how the class intends to answer factual and legal questions to prove its claim—and the extent to which the evidence needed to do so is common or individual." *Menocal*, 882 F.3d at 915 (citation omitted). This inquiry necessarily involves an analysis of the elements of the class's underlying cause of action. *Id.* Once the district court has identified the elements, the court then considers the proof necessary to establish those elements. *CGC Holding Co., LLC*, 773 F.3d at 1087 (noting that Rule 23(b)(3) analysis required court "to survey the elements of the class's [] claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not."). The district court "must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quotations and citations omitted). "Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately." *Chaparral Energy, LLC*, 923 F.3d at 789.

The Court first describes the elements of Mr. Rodriguez's and the putative class members' MWA claim. The MWA provides in relevant part that "[a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours." N.M. Stat. Ann. § 50-4-22(E). "To succeed on a NMMWA overtime compensation claim, a

24

plaintiff must establish: '(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime.'" *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 688 (D.N.M. 2019) (quoting *Self v. United Parcel Serv., Inc*., 1998-NMSC-046, ¶ 15, 970 P.2d 582, 589)).

The Court now describes Defendants' affirmative defenses. Defendants maintain that they were not required to pay Mr. Rodriguez and the putative class members overtime wages because they were employed in a bona fide executive or administrative capacity and as forepersons, superintendents and/or supervisors. *See* N.M. Stat. Ann. § 50-4-21(C) (stating that individuals "employed in a bona fide executive, administrative or professional capacity and forepersons, superintendents and supervisors" do not fall within the MWA's definition of "employee."). The FLSA contains a similar exemption. *See* 29 U.S.C. § 213(a)(1) (exempting "any employee employed in a bona fide executive, administrative, or professional capacity" from overtime pay requirement).

Regulations classify employees as "administrative" if (1) they are "[c]ompensated on a salary basis," (2) their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).[5] The second element, whether the employee's primary duty is directly related to management, requires consideration of whether the employee "perform[s] work directly related to assisting with the running or servicing

---

[5] Mr. Rodriguez provided the federal regulatory definition in 29 C.F.R. § 541.200 of an exempt "administrative" employee. In their response brief, Defendants did not explain if § 541.200 is the controlling interpretation. Nonetheless, the Court will assume that § 541.200 controls because New Mexico courts apply it when resolving whether an individual is an exempt administrative employee. *See Williams v. Mann*, 2017-NMCA-012, ¶ 30, 388 P.3d 295, 305.

of the business, as distinguished ... from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The phrase "exercise of discretion and independent judgment" "implies that the employee has authority to make an independent choice, free from immediate direction or supervision," *id*. at § 541. 202(c), and "[i]n general, … involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id*. at § 541.202(a).

As for the "executive" exemption regulations cited by Defendants, those rules apply to any person if (1) they are "[c]ompensated on a salary or fee basis," (2) their "primary duty is management of the enterprise," (3) they "customarily and regularly direct[ ] the work of two or more other employees," and (4) they "ha[ve] the authority to hire or fire other employees or" if their "suggestions and recommendations" on personnel decisions "are given particular weight." 29 C.F.R. § 541.100(a).[6] [7]

"A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations" defining executive and administrative employees. 29 C.F.R. § 541.2.

---

[6] Mr. Rodriguez alleges that Defendants' corporate representative, Bruck Morgan, confirmed during a deposition "that [Defendants were] not pursuing its executive exemption defense." ECF No. 30 at 18. But that deposition is not in the record, so the Court cannot confirm Mr. Morgan's statement. It appears that Defendants are indeed pursuing the executive exemption given that they plead the exemption in their answer and argue for its application in their opposition brief.

[7] In his motion, Mr. Rodriguez cites the New Mexico Administrative Code's previous definition of a "executive" that was in effect at the time of the alleged injury, but was repealed at the time Mr. Rodriguez filed his motion. *See* N.M. Admin. Code 11.1.4.7(C) (repealed 2017). The Court acknowledges this difference, but notes that it has no impact on the Rule 23 analysis since both the federal and state regulations that the parties rely on share the "primary duty" component.

Finally, both parties appear to cite the same New Mexico regulation that defines a "foreperson, superintendent and supervisor" as one whose: (1) "primary duty is to perform non-manual work related to management of the business;" and who (2) "exercise[s] discretion;" (3) "regularly assist[s] executives or perform[s] specialized work or special assignments;" and (4) "perform[s] less than twenty percent manual work." N.M. Admin. Code 11.1.4(F). "The New Mexico Administrative Code does not define or elaborate on the meaning of 'primary duty,'" however, courts consider the federal regulatory factors discussed *supra* in assessing an employee's primary duty. *Rivera v. McCoy Corp.*, 240 F. Supp. 3d 1150, 1156 (D.N.M. 2017).

Thus, because the applicability of all the exemptions at issue in this case turn on the putative class members' "primary duty," the Court next focuses on that component. Determining an employee's "primary duty" under the regulations requires analysis of "all the facts in a particular case," looking to the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

### i. Primary Job Duties

The consistent deposition testimony and declarations in the record show that the putative class members share the same primary duties. For instance, deposed PCOs and Defendants' representatives described PCOs' jobs in similar terms, including extensive preparatory work in Defendants' shop under the direction of shop managers; taking direction from an engineer on how to "rig up" a job; manually rigging-up equipment; constantly removing and replacing a well's night cap; and rigging-down equipment. *See e.g.* Depo. of Jose Samano, ECF No. 30-3 at 87:4-10, 14-25; 88:1-6, 88:22-89:1-19 (discussing securing "the right equipment," for a job while at the shop, "wash[ing] the whole unit," making sure the truck's fluids are topped off, and ensuring that the truck is mechanically sound); Depo. of Jeff Tranum, ECF No. 30-2 at 153:15 – 155:25

(describing PCOs' extensive preparatory work); Depo. of Uriel Sanchez, ECF No. 30-4 at 173:3-24 (confirming that shop managers would tell PCOs what equipment was needed for a job); *Id.* at 160:18-20 (explaining that an engineer at the worksite tells the PCO how to "rig up"); Depo. of Eddie Merryman, ECF No. 30-7 at 58:4-8 (describing "basic rig-up" process); Depo. of Jeff Tranum, ECF No. 30-2 at 248:7- 249:25 (describing wireline run); Depo. of William Carter, ECF No. 30-10, 24:1-25 (same); Depo. of Uriel Sanchez, ECF No. 30-4 at 77:15-18 (confirming that installing and removing the night cap could occur multiple times during a job); Depo. of William Carter, ECF No. 30-10 at 27:2-3 (same).

Moreover, the largely consistent declarations from 37 PCOs state that their primary duty was to maintain wellbore pressure by maintaining the grease pressure at the wellsite and that their tasks included preparatory work, traveling to job sites, rigging up, supporting wireline, rigging down, and heading back to the shop. Decl. of Joshua Salazar, ¶¶ 2-3, 5-8; Decl. of Jacob Lee Cowan, ¶¶ 2-3, 5-8, all located at ECF No 30-23. These same declarants claimed that they did not manage others, did not supervise two or more employees, did not make recommendations on how to run or improve Defendants' business affairs, and did not have responsibility for jobsite safety issues or advise on regulatory matters. ECF No. 30-23 at 43-45, ¶¶ 4, 10-13, 16-17; 61-63, ¶¶ 4, 10-13, 16-17.

Defendants argue that the content of these declarations is "boilerplate" and "should be viewed with suspicion." ECF No. 35 at n.6 (citing *Holmes v. Quest Diagnostics, Inc.*, No. 11-80567-CIV, 2012 WL 12876965, at *4-5 (S.D. Fla. June 14, 2012)). The Court agrees that the declarations appear to be nearly verbatim statements that contain only slight variations – something that courts "strongly disapprove[ ]" of in the context of Rule 23 certification motions. *Holmes,* 2012 WL 12876965, at *2. But in *Holmes*, the district court's strong disapproval of the boilerplate

affidavits tendered by a putative class of phlebotomists stemmed from the fact that the affidavits gave no details whatsoever about the class's central allegation that the defendant did not pay the phlebotomists for work "off the clock." *Id*. Here, in contrast, the declarations sufficiently particularize the substance of the putative class' allegations. Critically, the declarants describe what their primary duties did and did not consistent of, and thus go to the heart of the exemptions at issue in this case.

Defendants next assert that trainees were materially limited in their job duties because of their inferior skills compared to PCOs. For instance, Defendants' Regional Manager, Eddie Merryman, testified that trainees did not operate equipment on their own, *see* ECF No. 35-3 at 22:22-25, whereas deposed PCOs stated that they worked alone at jobsites and oversaw all aspects of the job. *See* ECF No. 35-10 at 96:1-9; Depo. of Vicente Torres, Jr., 129:3-24, ECF No. 35-15. Moreover, because of the complex nature of an oil well, Defendants contend that PCOs necessarily exercised independent judgment in monitoring wells and that trainees lacked the experience to use independent judgment. *See* Depo. of PCO Brandon Eylar, 116:2-18; 117:7-119:6 (describing the "different variables" of the job, including "temperature, tubes, well pressure, … fluid, dry gas" affecting whether to adjust or change equipment and stating that "you have to have knowledge to do the job."); Depo. of Eddie Merryman, ECF No. 35-3 48:5-14.

However, the Court does not find that this evidence requires examination, in a highly individualized fashion, of the work that a PCO versus a trainee performed. Mr. Merryman's testimony shows that trainees largely performed the same tasks as PCOs. The only two real restrictions on trainees' job duties that Mr. Merryman identified were that they worked with and were directed by a PCO at a wellsite, and that sometimes a trainee would work in the company shop rather than a wellsite. But even with those restrictions on their job duties, trainees mainly

performed the work of a PCO. *See e.g.*, Depo. of Jeffrey Tranum, ECF No. 35-5 at 107:5-12 (stating that a trainee working in the shop learns to "thread … flange sizes, different connections, knowing how to open and close BOPs, how to inspect them, function tests, pressure tests, wash equipment."). Even when trainees go into the field as opposed to the shop, they learn the rigging up/down process which, if successfully done, qualifies them for a promotion to a PCO. *See* Depo. of Bruce Morgan, ECF No. 100:25 – 101:1-7. Thus, the evidence shows that the primary duties performed by putative class members are highly similar.[8]

Defendants also argue that PCOs and trainees had different duties because PCOs trained the trainees, whereas trainees obviously lacked such duties. In addition, Defendants point out that PCOs could recommend trainees for promotion whereas trainees could not. For instance, PCO Carrizales testified that during a certain period of his employment he was primarily training other employees, *see* ECF No. 35-8 at 24:10 – 25:13, and Defendants point to the testimony of at least five PCOs who testified that they trained trainees and sometimes reported to management about whether the trainees should be promoted. While the Court agrees with Defendants that there are elements of the PCO position that vary from that of the trainee, such distinctions do not defeat predominance given that the evidence tends to show that PCOs and trainees share similar primary job responsibilities to perform manual work at Defendants' shop or customer oil fields.

---

[8] In his reply brief, Mr. Rodriguez contends that in discovery documents Defendants freely referred to PCOs and trainees, and that this is evidence that Defendants consider PCOs and trainees as one and the same. As support, Mr. Rodriguez cited "Ex. A, Response to Rog 5." But the Court cannot find "Ex. A, Response to Rog 5." The Court notes that this is one of numerous instances where Mr. Rodriguez either inaccurately cited the record or failed to include an exhibit. To complicate things even more, Mr. Rodriguez did not label his exhibits. In future filings, Mr. Rodriguez should take care to (1) attach and label exhibits and (2) accurately cite the record. Mr. Rodriguez's failure to do so has hampered the Court's ability to review an already excessively voluminous record that is over 600 pages long. Lastly, Mr. Rodriguez will consistently cite the record by means of highlighting, underlining, etc. in accordance with D.N.M.LR-Civ. 10.6.

Finally, Defendants contend that trainees' – and some PCOs' – lack of a commercial driver's license will require individualized proof of "what motor vehicle [class members] operated, how often, and during what time," and that these issues undercut predominance. ECF No. 35 at 10. However, the Court fails to see how these issues are dispositive, or how they shift the calculus in Defendants' favor given that the weight of the declarations and depositions in the record show that PCOs and trainees have largely consistent primary duties.

In support of their arguments against predominance, Defendants rely on this Court's decision in *Casias v. Distribution Mgmt. Corp., Inc.*, No. CV 11-00874 MV/RHS, 2014 WL 12710236 (D.N.M. Mar. 31, 2014), but the facts and holding in *Casias* are distinguishable. In *Casias*, courier drivers challenged their employer's practice of classifying them as independent contractors, rather than employees under the MWA. 2014 WL 12710236 at *1. The plaintiffs supported their motion for class certification with their own sworn affidavits which claimed that their employer controlled the ways, means, and manner of the plaintiffs' delivery services. *Id*. at *14-15. The Court held that the affidavits did not show the employer controlled the plaintiffs' work; rather, each affidavit was "individualized and applicable only to the persons providing the testimony," and thus the plaintiffs' wage claims "turn[ed] on their day-to-day work and not upon any company-wide contractual policies." *Id*. at *16. Here, in contrast, the declarations and deposition testimony in the record so far reflect that PCOs and trainees' duties are largely consistent, whether working in the field or at Defendants' shop. Moreover, as explained in the next subsection, Defendants classified Mr. Rodriguez and the putative class members pursuant to a uniform exemption policy, which also makes *Casias* distinguishable.

### ii. Uniform Exemption Policy

The Court next considers whether Defendants' blanket application of exemption status to the putative class members facilitates common proof. "An internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the employees are too diverse for uniform treatment. Therefore, an exemption policy is a permissible factor for consideration under Rule 23(b)(3)." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). A district court abuses its discretion, however, by relying on uniform policies "to the near exclusion of other relevant factors touching on predominance." *Id*. at 955.

Here, the Court finds that the uniform exemption policy is probative, but not dispositive, common evidence. It suggests that Defendants considered the employees to be similar at least to some degree. Moreover, the Court does not rely on the existence of Defendants' uniform exemption policy to the *exclusion* of other factors. As the "primary duty" discussion *supra* shows, Mr. Rodriguez's and the putative class members' evidence supports a finding that common questions will predominate.

### iii. Damages

Defendants contend that individual issues with respect to damages will predominate over common issues. "[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Menocal*, 882 F.3d at 922–23 (citation omitted). At the class certification stage, a plaintiff is not required to demonstrate through common evidence the precise amount of damages incurred by each class member. *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) (citations omitted). "But [courts] do expect the common evidence to show all class members suffered *some* injury." *Id*. "If the issues of liability are genuinely common issues,

32

and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

Defendants contend that because the percentage of time that employees allegedly worked overtime in New Mexico is not uniform across the class, individualized evidence of each putative class member's workweek in New Mexico will be required. However, "damages determinations are individual in nearly all wage-and-hour class actions," which is precisely why damages calculations alone cannot defeat certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). Mr. Rodriguez convincingly says in his reply brief that Defendants' "own business records, which establish the hours worked by PCOs at specific well sites, can easily establish when PCOs worked over 40 hours in a week in New Mexico." ECF No. 41 at 8. Thus, his proposed measure of damages is directly linked with his theory of Defendants' liability that Defendants misclassified PCOs and failed to pay them overtime wages.

In summary, Mr. Rodriguez has satisfied Rule 23(b)'s predominance component.

**c. Superiority**

In addition to demonstrating the predominance of common questions, Mr. Rodriguez must also demonstrate that resolution of the issues on a class-wide basis is superior to other available methods for the fair and efficient adjudication of the controversy. In making this assessment, the Court should consider (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (c) the desirability or

undesirability of concentrating the litigation of the claims in the particular forum, and (d) the likely difficulties in managing a class. Fed. R. Civ. P. 23(b)(3).

Concerning the first requirement – class members' interest in individually controlling the prosecution – the Court cannot locate specific arguments from Defendants and therefore the Court will assume that this component is met.

With respect to the second superiority factor – the extent and nature of any litigation concerning the controversy already commenced by or against members of the class – Defendants contend that Mr. Rodriguez and his lawyers have created a "procedural quagmire" by filing two class actions on behalf of the same class members, with the same attorneys, against the same Defendants. ECF No. 35 at 24. Defendants allege that Mr. Rodriguez has "offered no trial plan or explanation of how to manage the potential for double recovery created by" the two judicial proceedings, and that his actions have "complicate[d] a global resolution." *Id*. Mr. Rodriguez says in his reply that he chose to file this lawsuit in the District of New Mexico because (i) the MWA does not recognize the Motor Carrier Act, (ii) the MWA allows for treble damages, (iii) treble damages under the MWA and liquidated damages do not constitute double-recovery, and (iv) he wished to "help his fellow [PCOs] whose claims were cut off by the statute of limitations by alleging a continued violation of the" MWA. ECF No. 41 at 14.

The Court believes that Defendants have raised legitimate concerns. The *Snively* litigation, which is pending (as far as the Court knows) progressed through extensive discovery, as evidenced by the substantial deposition transcriptions in the record, which are all from the *Snively* litigation. The parties also went through motions practice, including a motion for conditional certification, which the federal district court granted. Moreover, Mr. Rodriguez's reply brief addresses in a cursory fashion many of Defendants' "procedural quagmire" concerns. Nonetheless, the answer is

not to deny Mr. Rodriguez's motion. Rather, issues about procedural complications can be revisited later. This Court has stated in the class modification context that "[i]f it becomes apparent later in th[e] litigation that the class is not administratively feasible or individual issues predominate, the parties may file motions for appropriate relief, such as a motion to decertify or modify the class." *Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *9 (D.N.M. June 5, 2018) (citing *United Steel Workers Int'l Union v. ConocoPhillips Co.,* 593 F.3d 802, 807 (9th Cir. 2010) (district court "retains the flexibility to address problems with a certified class as they arise, including the ability to decertify.")) (other citations omitted). Accordingly, rather than deny Mr. Rodriguez's motion for class certification, the Court instead will reconsider and decertify the class if there is real evidence that maintenance of this lawsuit as a class action is neither sensible nor superior given the presence of the FLSA action in *Snively*.

The third superiority factor – the desirability of the forum – consists of two prongs: "(i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute." *Zuniga v. Bernalillo Cty.*, 319 F.R.D. 640, 694 (D.N.M. 2016). The "first prong … is considered a recitation of the general superiority inquiry" while the "second prong is whether the particular court at issue is a desirable forum for the litigation." *Id*. Concerning the first prong, judicial economy supports aggregation of numerous MWA claims rather than numerous individual claims. Concerning the second prong, some issues that the Court considers are "(i) the geographic convenience of the parties, witnesses, or class counsel, … (ii) the locus of the harm, as well as any other events forming the basis of the action; (iii) the location of the bulk of the proposed class … and (iv) whether the defendant is located in the forum state." *Id*. Here, on the one hand, Defendants are in Texas and the parties' law firms are based in Texas and Louisiana. On the other hand, the locus of the harm occurred partially in New Mexico and Mr.

Rodriguez lives in New Mexico. The Court has no information about "the location of the bulk of the proposed class." Overall, the third superiority prong weighs in Mr. Rodriguez's favor.

The fourth and final factor that the Court must consider in assessing superiority is "the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims – in particular the individual issues – and fairly distributing relief among the class members." *Id.* at 694–95. Given the relatively small size of the putative class and its discrete geographical location, the Court does not foresee manageability issues precluding certification.

In summary, Mr. Rodriguez has satisfied the superiority element of the Rule 23(b)(3) analysis.

Finally, as this Court explained in *Lavigne*, district courts "may *sua sponte* modify a class definition" to obtain necessary precision. 2018 WL 2694457, at *9 (citing *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions, so the district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed.")); *In re Monumental Life Ins. Co.,* 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision."). To achieve necessary precision and make the class definition clear to potential class members, the Court modifies the class as follows:

> Defendants' current and former pressure control operators, **field service technician trainees, field service technicians, operator trainees, trainees,** and pressure controllers who receive pay on a salary or salary-plus-bonus basis who worked over 40 hours in at least one workweek in New Mexico over the past three years.

E.     **CONCLUSION**

**IT IS THEREFORE ORDERED that** Plaintiff Jacob Rodriguez's "Motion in Support of Rule 23 Class Certification" (**ECF No. 30**) is **GRANTED** and the above class is **CERTIFIED** pursuant to Fed. R. Civ. P. 23(b)(3). This certification is **without prejudice** and may be modified by a party or the Court, and Defendants may file a motion for decertification as explained above;

**IT IS FURTHER ORDERED that** Jack Siegel and Derek Braziel of the Siegal Law Group PLLC are appointed as class counsel pursuant to Fed. R. Civ. P. 23(g);

**IT IS FINALLY ORDERED that** Mr. Rodriguez's counsel will submit to Defendants a proposed plan for class notice. The parties shall then either jointly submit a proposed notice to the Court for approval, or Mr. Rodriguez shall file an opposed motion for approval of notice.

**IT IS SO ORDERED**.



_____
Judith C. Herrera
Senior United States District Judge